UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHRISTOPHER SMOLINSKI,

        Plaintiff,                       Case No. 1:23-cr-10998

v.                                         Honorable Thomas L. Ludington
                                                   United States District Judge
ADVANCED CORRECTIONAL
 HEALTHCARE, INC., et al.,

        Defendants.
_____/

**OPINION AND ORDER (1) GRANTING DEFENDANTS' ADVANCED CORRECTIONAL HEALTHCARE, MISCHLONEY, AND PIOSZAK'S MOTION FOR SUMMARY JUDGMENT; (2) GRANTING PLAINTIFF'S MOTION FOR VOLUNTARY DISMISSAL AS TO DEFENDANT ALPENA COUNTY; (3) DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE**

On April 28, 2023, Plaintiff Christopher Smolinski filed a complaint against Defendants Advanced Correctional Care (ACH), Dorothy Pioszak, Debra Mischloney, and Alpena County. ECF No. 1. Plaintiff alleged that he was given improper treatment for a wound on his right ankle while confined in Alpena County Jail, and, as the wound got progressively worse and an infection was suspected in his bones, he was denied the opportunity to see an outside specialist. *Id.* at PageID.5–7. After his release, Plaintiff's foot had to be amputated. *Id.* at PageID.7. On January 27, 2025, Defendants ACH, Pioszak, and Mischloney filed a Motion for Summary Judgment. ECF No. 31. For the following reasons, the Motion will be granted.

I.

A.

On May 12, 2020, Plaintiff began serving a four-month sentence at Alpena County Jail. ECF No. 31 at PageID.278; *see* ECF No. 36 at PageID.686. Defendant ACH provides healthcare to the Alpena County Jail. ECF No. 31 at PageID.278. Defendant Pioszak is a Nurse Practitioner

(NP), and Defendant Mischloney is a Registered Nurse (RN). *Id.* The two of them are the primary healthcare providers that ACH provides to the Alpena County Jail. *Id.* After Defendant Mischloney sees an inmate, she reports her assessment to Defendant Pioszak, who then provides a diagnosis and treatment. ECF No. 36 at PageID.686. The pair appears to have seen the Plaintiff often.

On May 13, 2020, Plaintiff completed an intake screening upon which he indicated a history of infectious diseases and a right foot injury, which was draining fluid. *Id.* Years before his incarceration, Plaintiff had undergone right ankle surgery and, as a result, suffered a recurring wound related to that surgery. *Id.* at PageID.687. On May 20, 2020, Defendant Mischloney became aware of Plaintiff's previous right ankle surgery and the fact that he was in constant pain because of it. *Id.* But all medical requests ("Kites") that Plaintiff sent in from May 16, 2020–June 6, 2020, were centered around dental issues and headaches. ECF No. 31 at PageID.279. Defendant Mischloney saw him for each of these requests, and Defendant Pioszak prescribed a treatment plan and medications, including Tylenol, Chlorhexide (oral rinse), and Orajel. *Id.* On May 26, 2020, Plaintiff submitted another Kite requesting more pain medication. ECF No. 36 at PageID.687. The Kite does not indicate where Plaintiff felt pain. *Id.* While Defendant Mischloney saw him, and she acknowledges that she wrote down something about his ankle, it is unclear if it was related to pain. *Id.* Regardless, Plaintiff was extended 1000 milligrams (mgs) of Tylenol for his pain. ECF No. 31 at PageID.279.

It is not until June 16, 2020, over a month into his sentence, that Plaintiff sent a medical request notifying the jail that he needed to be seen "ASAP" for his ankle wound, medication for his pain, and more bandages for his "hole." ECF No. 36 at PageID.688. On June 17, 2020, Plaintiff was seen by Defendant Mischloney, who noted a right ankle ulcer measuring 1.4cm x 0.7cm x 0.2cm and that Plaintiff complained of yellow drainage for 2 days. ECF No. 31 at PageID.281.

Defendant Pioszak prescribed Plaintiff A&D ointment, Diclofenac 1% gel, dressing with a gauze once a week, and ibuprofen 600mg two times a week. *Id.* Plaintiff was also ordered to follow a high-protein diet. *Id.* Defendant Pioszak agreed that none of these medications treated an infection and that *yellow* discharge could be a sign of an infection. ECF No. 36 at PageID.688. But Defendant Pioszak was not convinced Plaintiff had an infection because she had not yet examined Plaintiff. *Id.*

On June 20, 2020, four days later, Defendant Pioszak examined Plaintiff for the first time. *Id.* at PageID.689. Defendant Pioszak noted right ankle edema[1] with white discharge. ECF No. 36 at PageID.689. She also noted an upcoming appointment off-site at a wound clinic on June 25, 2020, five days after Plaintiff's appointment with her. *Id.*

On June 21, 2020, Plaintiff sent another Kite to Defendant Mischloney, indicating that his wound had gotten worse, that it was bigger, burned, and his foot was swollen and numb. *Id.* He was seen by Defendant Mischloney the next day. She observed only clear drainage from the wound, not yellow, but noted that the wound was larger than the last time she had seen Plaintiff. *Id.* Defendant Mischloney's assessment, per the advisement of Defendant Pioszak, was that Plaintiff's wound needed to be cleaned at the wound clinic. *Id.*

On June 25, 2020, Plaintiff attended his appointment at the wound clinic at MidMichigan Health, where he met with NP Straley. *Id.* at PageID.690. Plaintiff told NP Straley that his wound had opened one to two weeks earlier. *Id.* At this time, the wound measured 2.5cm x 1cm x 0.2 cm.

---

[1] "Edema is swelling caused by too much fluid trapped in the body's tissues. Edema can affect any part of the body. But it's more likely to show up in the legs and feet." *Edema*, Mayo Clinic, (last visited September 4, 2025), https://www.mayoclinic.org/diseases-conditions/edema/symptoms-causes/syc-20366493 [https://perma.cc/83K9-3QX2].

ECF No. 31 at PageID.284. NP Straley debrided Plaintiff's wound, after which Plaintiff was instructed to change his dressing every three days. *Id.*

Defendant Pioszak did not recall if Plaintiff was given his bandages to keep with him in his cell or if he was given the supplies when needed. ECF No. 36 at PageID690. Defendant Mischloney testified that if Plaintiff ran out of bandages, all he would need to do is send a Kite for more bandages. ECF No. 31-5 at PageID.431. But Plaintiff testified that there were times when sufficient medical supplies were not available to him, such as proper wraps or bandages. ECF No. 31-2 at PageID.331. But Plaintiff noted that he received sufficient supplies from the wound clinic. *Id.*

Plaintiff was seen again by the wound clinic on July 2, 2020. ECF No. 36 at PageID.691. Plaintiff was again instructed that he needed to clean and change his dressing every three days. *Id.*

On July 8, 2020, Defendant Mischloney again examined Plaintiff after a Kite in which he indicated that he needed to "see medical ASAP" for his ankle. *Id.* Plaintiff complained about pain in his right leg, and it was noted that his right calf and foot were swollen. *Id.* Plaintiff contends that during this time, he had been as compliant with his care and changing his dressings to the extent that he could because he was not allowed some of the required medical supplies in his cell. ECF No. 31-2 at PageID.335. But Plaintiff also testified that he could have requested those medical supplies:

> They have to give you that. So you have to ask or write a kite and you to get, you know, your tape…brought to you because they don't allow you to keep tape in the cell, so-

*Id.* Plaintiff also testified that he would change his own dressings at night in jail, *id.*, and that he had proficient knowledge of how to change his dressing:

> Q: But you were instructed on how to care for your wound-
> 
> A: Yeah. By Mr. Straley, yeah.

*Id.*

On July 9, 2020, Plaintiff was seen again by the MidMichigan wound clinic. ECF No. 31 at PageID.287. Plaintiff showed up with only a band-aid on his wound and alleged that appropriate dressings were not available to him at the jail. *Id.* But just the day before, Defendant Mischloney had reported changing his dressing while she had seen him that day. *Id.* NP Straley noted that Plaintiff had periwound maceration[2] upon arrival and was treated. ECF No. 36 at PageID.691 (emphasis omitted). NP Straley provided Plaintiff with a referral to orthopedic surgeon Dr. Dombrowski, who had previously treated Plaintiff, and for an ultrasound. ECF No. 31 at PageID.288.

Three days later, Plaintiff submitted another Kite stating that "something is majorly wrong", and that "this is getting very past what you guys can do for me here." ECF No. 31 at PageID.288–89. Plaintiff was seen by Defendant Pioszak the next day, July 13. *Id.* She noted the Plaintiff's pain and provided him with Tylenol. ECF No. 36 at PageID.692.

That same day, Plaintiff saw Dr. Dombrowski, who concluded that an amputation of Plaintiff's ankle was not needed, and that he had nothing further to offer him from an orthopedic standpoint. ECF No. 31 at pageID.289. But he noted that Plaintiff could get a second opinion if he wished. *Id.*

---

[2] Periwound maceration is defined as "the softening and breakdown of the skin [surrounding the wound] as a result of prolonged exposure to moisture." *Quick Guide: Periwound Maceration*, WOUNDS UK (Nov. 3, 2022), https://wounds-uk.com/quick-guides/quick-guide-periwoundmaceration/#:~:text=Maceration%20is%20described%20as%20%E2%80%9Cthe,increasing%20 their%20susceptibility%20to%20trauma [https://perma.cc/DP5D-AFLV]. Macerated skin is white, soggy, and contributes to increased wound size and length of treatment. See *Periwound Management: What Clinicians Should Know*, WOUNDS PRO (Jan. 31, 2023), https://www.thewoundpros.com/post/periwound-management-what-clinicians-shouldknow#:~:text=The%20macerated%20periwound%20skin%20is,increased%20risk%20of%20con tact%20dermatitis [https://perma.cc/Y2XC-KZGK].

On July 16, 2020, Plaintiff appeared for his weekly visit to NP Straley, the wound clinic—his *fifth* one to date. *Id.* He was told to change his dressing every other day, which was more frequent than previously advised. ECF No. 36 at PageID.692. NP Straley noted that Dr. Dombrowski recommended a second opinion, and that the Plaintiff had a preferred orthopedic surgeon picked out. ECF No. 31 at PageID.290. Plaintiff contends that it was he, his wife, and NP Straley who were trying to coordinate his second opinion, and admitted that the Defendants *did not* stop him from obtaining this second opinion:

> Q: It was doctor—or Jacob Straley who was trying to get this second opinion set up, along with your wife, who was trying to assist in recommending a doctor to get a second opinion from; right?
>
> A: *Yeah, that's correct. She was working with—with Jacob* [Straley]…
>
> Q: So RN Mischloney and NP Pioszak had nothing to do with trying to get this-this doctor who was going to give a second opinion? *That was all Mr. Straley's office and you and your wife trying to coordinate something; right?*
>
> A: *Correct.*

ECF No. 31-2 at PageID.358–59 (emphasis added).

On July 21, 2020, Plaintiff underwent an ultrasound, which revealed no sonographic abnormalities. ECF No. 31 at PageID.291. Two days later, Plaintiff went back to see NP Straley at the wound clinic, where he was provided with a week's worth of dressings. *Id.*

On July 28, 2020, Plaintiff was seen again by Defendant Pioszak at the jail, where she ordered that he continue his treatment with the wound clinic and with the dressing changes. *Id.* at PageID.292. On July 30, 2020, Plaintiff was seen again at the MidMichigan wound clinic—his *seventh* visit. The size of his wound had decreased, and he was provided with a new set of bandages. *Id.* On August 2, 2020, Plaintiff submitted yet another medical request at the jail, indicating that he was in extreme pain and needed more Tylenol. ECF No. 36 at PageID.692.

Defendant Mischloney saw Plaintiff the next day and refilled his Tylenol. ECF No. 31 at PageID.292.

On August 6, 2020, Plaintiff was seen again by the wound clinic—his *eighth* visit. *Id.* at PageID.293. While there, NP Straley noted that Plaintiff's wife had been in contact with a University of Michigan Orthopedic surgery referral, and that they wanted Plaintiff to be seen at a University of Michigan wound clinic downstate before an appointment with the second orthopedic surgeon. *Id.*

On August 11, 2020, Plaintiff saw Defendant Pioszak in jail and complained to her that he thought his ankle was infected. ECF No. 36 at PageID.692. The next day, his referral for a second opinion was confirmed, and the jail and medical staff were notified that Plaintiff's appointment was set for August 26, 2020. ECF No. 31 at pageID.293.

But Plaintiff was discharged from the Alpena County Jail on August 19, 2020, before he was set to receive a second opinion. ECF No. 36 at PageID.692. Upon his release, Plaintiff was again seen at the wound clinic and continued to follow up with the orthopedic surgery department at the University of Michigan. *Id.* at PageID.693. On September 2, 2020, he was scheduled for an MRI, and MidMichigan Health records indicated that they had a strong suspicion of osteomyelitis[3] by that point. *Id.* Plaintiff continued treatment, including surgery in November 2020, for chronic osteomyelitis. *Id.* Plaintiff ultimately underwent an amputation; however, that was two years post-jail discharge, on June 23, 2022. *Id.*

---

[3] Osteomyelitis is defined as a "serious infection of the bone" Osteomyelitis, NAT'L LIBRARY MED., (last updated May 31, 2023), https://www.ncbi.nlm.nih.gov/books/NBK532250/#:~:text=Osteomyelitis%20is%20a%20serious%20infection,bloodstream%2C%20fractures%2C%20or%20surgery [https://perma.cc/3P5PADHJ]. Symptoms of osteomyelitis include erythema, swelling, fever, and chills. *Id.* Complications include septic arthritis, abscess, bone deformity, and systemic infection. *Id.*

**B.**

On April 28, 2023, Plaintiff sued Alpena County Jail, ACH, and Defendants Mischloney and Pioszak in their individual capacities. ECF No. 1. The Complaint alleges four violations of 42 U.S.C. § 1983: deprivation of Plaintiff's Fourteenth Amendment Rights by Defendants Mischloney and Pioszak, *id.* at PageID.7–10 (Count I); deprivation of Plaintiff's Eighth Amendment rights by Defendants Mischloney and Pioszak, *id.* at PageID.10–12 (Count II),[4] deprivation of both rights by Defendant ACH, under a Monell theory of § 1983 liability, *id.* at PageID.12–14 (Count III); and deprivation of both rights by Defendant Alpena County Jail, under a Monell theory of § 1983 liability. *Id.* at PageID.14–16 (Count IV).

In Count I, Plaintiff alleges that Mischloney and Pioszak were deliberately indifferent to his serious medical needs, thus violating his Fourteenth Amendment rights. *See id.* at PageID.7–10. In Count II, Plaintiff alleges Mischloney and Pioszak caused him "great physical pain, emotional distress, humiliation, degradation, and suffering[]" in violation of his Eighth Amendment right to be free from cruel and unusual punishment. *See id.* at PageID.10–12.

In Counts III and IV, Plaintiff alleges Monell claims against Defendants ACH and Alpena County Jail. *See generally* ECF No. 1 at PageID.12–16. Specifically, Plaintiff alleges a "custom, policy, and/or practice" of (1) "ignoring substantial risks of serious harm to inmates" by "deliberately choosing less efficacious treatment," *id.* at PageID.13, 15, and (2) "failing to refer inmates for necessary off-site medical treatment," *id.* at PageID.14, 16. Plaintiff also alleges a "fail[ure] to properly train and supervise . . . employees or contractors to monitor and address

---

[4] Erroneously labeled "Count I" in plaintiff's Complaint.

inmate[s]' serious medical conditions and provide proper diagnosis and treatment." *Id.* at PageID.14, 16.

On June 27, 2023, Defendants ACH, Pioszak, and Mischloney filed a Motion to Dismiss. ECF No. 6. This Court denied the motion, allowing the Plaintiff's deliberate indifference claims to proceed to discovery against Defendants Pioszak and Mischloney. *Smolinksi v. Advanced Corr. Healthcare, Inc.*, No. 1:23-CV-10998, 2023 WL 6519257, at *8 (E.D. Mich. Oct. 5, 2023). This Court also ruled that Plaintiff did not state a *Monell* claim against Defendants ACH and Alpena County under a practice or customs theory, *Id.* at *9; however, the Court found that Plaintiff did state a *Monell* claim against both under a failure to train theory; in particular, under a "single-incident" theory. *Id.* at *11–12. In so doing, this Court held that "the facts of the Complaint plausibly indicate that ACH employees—trained medical professionals who had notice of Plaintiff's worsening wound—knew that Plaintiff may have been suffering from osteomyelitis but failed to ensure Plaintiff was seen by an appropriate specialist." *Id.* at *11.

Discovery soon followed, and then came this Motion for Summary Judgment. ECF No. 31. A couple of weeks later, Plaintiff filed a currently pending Motion for Voluntary Dismissal as to Defendant Alpena County, ECF No. 35, and Defendants ACH, Pioszak, and Mischloney filed a Response. ECF No. 37. Because Defendant's Motion for Summary Judgment will be Granted, Plaintiff's Motion for Voluntary Dismissal will be granted as non-prejudicial to the other Defendants.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrates the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party, who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). This Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III.

There is no genuine dispute as to any material fact that Defendant's Pioszak and Mischloney's actions did not constitute deliberate indifference.

Under 42 U.S.C. § 1983, a plaintiff may sue any "person" who, under the color of state law, subjects any citizen to the deprivation of any rights, privileges, or immunities secured by the Constitution *See* 42 U.S.C. § 1983. Accordingly, to "prevail on a cause of action under § 1983, a plaintiff must prove (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018); *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015); *see also Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2015).

### A.

During Discovery, it was revealed that Plaintiff was a "sentenced inmate at the time of his incarceration." ECF No. 31 at PageID.264. Plaintiff admits this in his response to Defendants' Motion for Summary Judgment. ECF No. 36 at PageID.686. Therefore, Plaintiff's deliberate indifference claims will be analyzed under the Eighth Amendment framework. *See, e.g., Absher v. Berlin*, No. 1:20-CV-13383, 2021 WL 2579754 (E.D. Mich. June 23, 2021) ("[I]f the plaintiff was a convicted prisoner at the time of the incident, then the Eighth Amendment deliberate indifference standard" applies but that "the Fourteenth Amendment is the source of a pretrial detainee's . . .

claim"); *Tucker v. Corizon Corr. Healthcare, Inc.*, No. 2:19-CV-170, 2020 WL 830700, at *3 (W.D. Mich. Feb. 20, 2020) ("Where, as here, Plaintiff is not a pretrial detainee, but a convicted prisoner, the Eighth Amendment is the primary source of substantive protection."); *see also Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008) (holding that because the Eighth Amendment supplies the explicit textual source of constitutional protection for claims governing a prisoner's health and safety, the plaintiff's substantive due process claim was subject to dismissal).

A prisoner asserting a deliberate indifference claim under the Eighth Amendment must show: (1) an objectively serious medical need, and, subjectively, "(2) that the defendant knew 'of and disregard[ed] an excessive risk to [the prisoner's] health or safety.'" *Est. of Abbey v. Herring*, 598 F. Supp. 3d 572, 583–84 (E.D. Mich. 2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994); *Rhinehart v. Scutt*, 894 F.3d 721, 737–38 (6th Cir. 2018)).

Under the objective prong, "[a] serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004)).

Under the second, subjective prong, a plaintiff must demonstrate a high standard of culpability, equivalent to criminal recklessness. *Est. of Abbey*, 598 F. Supp. at 584; *Greene v. Crawford Cty., Michigan*, 22 F.4th 593, 605 (6th Cir. 2022) (quoting *Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 568 (6th Cir. 2020)). In other words, the plaintiff must show that each defendant "'subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Rhinehart*, 894 F.3d at 738 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

The Plaintiff's deliberate indifference claims fail because there is no dispute as to any material fact related to the subjective prong.[5]

In his reply brief, Plaintiff only identifies one potential disputed area of genuine fact: denial of appropriate dressings. ECF No. 36 at PageID.699. Plaintiff argues that whether Defendants Pioszak and Mischloney provided him with appropriate dressings to care for his wound is a question of fact that is central to his deliberate indifference claims. *Id.* at PageID.698. Plaintiff contends that there were times when proper wrappings and bandages to dress his wounds were not available. *Id.* at PageID.690. As an example, Plaintiff provides his July 9, 2020, visit to the wound clinic, where he showed up with only a band-aid over his wound because he lacked the appropriate dressing. *Id.* at pageID.691.

But Defendant Mischloney testified that he would need to send a Kite for bandages, as they were kept on the jail cart:

> Q: Who is responsible for making sure that the inmate has access to the things that he needs to comply with that [medical plan]?
>
> A. So it's on the medical cart, so when meds go around twice a day it's on it's on the med cart with [Plaintiff's] name on a baggy.
>
> And the wound clinic would always—they were very diligent about sending enough supplies…[a]nd then if he ran out of something all he had to do was send in a kite, and we have bandages.

ECF No. 31-5 at PageID.431.

In fact, Plaintiff admitted in his own testimony that he knew to send a Kite for bandages if he needed some:

> They have to give you that. So you have to ask or write a kite and you to get, you know, your tape…brought to you because they don't allow you to keep tape in the cell, so-

---

[5] Defendant makes no apparent arguments related to the objective prong of the deliberate indifference standard; however, the Court will grant summary judgment under the subjective prong, so analysis under the objective prong is unnecessary.

ECF No. 31-2 at PageID.335. But the record shows that Defendant only ever asked for bandages in his June 16, 2020, Kite, a full month after he was incarcerated at Alpena County Jail:

> need to see you ASAP for my ankle review for meds and pain, more bandages for my hole, and sign records for my attorney [i]n court, need to refill my gel, and get my meds worked out Thax,

ECF No. 31-7 at PageID.525. While at other times, Plaintiff complained about pain and swelling in his ankle, *see, e.g., id.* at pageID.531, 591, Plaintiff never again requested access to bandages in another Kite. *See generally*, ECF No. 31-7.

Plaintiff testified that the jail did not have the proper supplies for his dressings. ECF No. 31-2 at PageID.331. But Plaintiff also testified that the wound clinic provided him with plenty of supplies for his dressings:

> Q: Okay. Did the wound clinic provide you any supplies?
>
> A: Yes, they did.
>
> Q: Okay. Did they provide you adequate supplies?
>
> A: Yes, they did.

*Id.* In fact, Plaintiff went to the Wound Clinic *eight* times, based on the record. *See generally*, ECF No. 31-7. Plaintiff testified that it was NP Straley at the wound clinic who instructed him on how to change his dressings and how often. ECF No. 31-2 at PageID.335.

From the record, it's clear that plaintiff had access to bandages, either from the wound clinic, or from the jail cart via a Kite request. Plaintiff simply needed to ask for bandages to dress his wounds. Next, the Court must determine if Defendants Pioszak and Mischloney were aware that Plaintiff needed bandaging. The Court finds that they did not.

Under the subjective prong of the deliberate indifference standard, an "inflicting official [must] act or fail to act with subjective awareness of the deprivation." *Loggins v. Franklin Co.*, 218 F App'x 466, 473 (6th Cir., 2007) (citing *Brooks v. Celeste*, 39 F.3d 125, 129 (6th Cir. 1994)).

"The state of mind requires that the official 'consciously disregard' a substantial risk of serious harm." *Brooks*, 39 F.3d at 128.

But there is no evidence that either Defendant Pioszak or Mischloney was aware that Plaintiff did not have access to bandages as he alleges. Defendant Pioszak testified that she believed that Plaintiff had adequate supplies from the wound clinic:

> A: Because he had adequate supplies.
>
> Q: And that's based on your recollection?
>
> A: It's based on if you read what the discharge from the wound clinic says, it says they are discharging him with enough for the wounds, that they do the first one and that he does every three days after, and that he has adequate supplies, and it says that throughout.

ECF No. 31-6 at PageID.465. Furthermore, Defendant Pioszak testified that if Plaintiff needed more dressings for his wound, all he would need to do would be to send a Kite. *Id.*

Also, in his reply brief, Plaintiff acknowledges Defendant Pioszak's testimony that she was unsure if he was given the bandages to keep in his cell or if he was given the supplies when needed. ECF No. 36 at PageID.690. Plaintiff's admission is dispositive of the fact that Defendant Pioszak was not subjectively aware that Plaintiff may or may not have been without dressings for his wound, absent a Kite.

Likewise, Defendant Mischloney was also unaware that Plaintiff may have been without the proper dressings. Like Pioszak, she testified that she assumed that Plaintiff had access to bandages because the wound clinic sent him back with supplies, and, if he needed more, she assumed that he would send a Kite. ECF No. 31-5 at PageID.431 ("And the wound clinic would always—they were very diligent about sending enough supplies…[a]nd then if he ran out of something all he had to do was send in a kite, and we have bandages."). Plaintiff also acknowledges this testimony in his reply brief. ECF No. 36 at PageID.690.

Plaintiff notes that a denial of appropriate dressings for a wound can interrupt a prescribed treatment plan, which has been found to satisfy the subjective prong of the Eighth Amendment deliberate indifference claim. *See Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991). However, Plaintiff has not presented any evidence that either Defendant Pioszak or Mischloney even *knew* he was out of bandages, let alone that they interrupted his proscribed treatment by preventing him from obtaining new bandages. In fact, the evidence in the record indicates that Plaintiff was provided ample medication and assistance when he asked for it. *See generally*, ECF No. 31-7.

Thus, because Defendants Pioszak and Mischloney were never aware that Plaintiff needed new bandages, Plaintiff's deliberate indifference claim fails the subjective prong.

**B.**

Even if Plaintiff could present a question of fact related to their deliberate indifference claim, he has failed to address the Defendant's causation questions raised on summary judgment.

Defendant argues that there is no evidence that plaintiff had an infection while he was incarcerated. ECF No.31 at pageID.299. Defendant Pioszak testified that Plaintiff's white blood cell count was not elevated, which would have indicated an infection. ECF No. 31-6 at PageID.465.

But Plaintiff's medical records indicate that he reported having a fall on August 2, 2021, a year after his release from Alpena County Jail, in which he suffered a "new ankle wound." ECF No. 31-11 at PageID.655. On September 15, 2021, Plaintiff saw his orthopedic doctor about his wound, who encouraged him to "present to the emergency department" to get an MRI for osteomyelitis as "progression of this wound or possible [bacteria] could be limb or life threatening." *Id.* at PageID.656. But from the patient notes on his next visit, it is unclear if he ever went to the emergency department:

> strongly recommended the patient seek further evaluation in the ED of his right foot wound due to concerns of infection and has been worsening. We discussed his condition can be life threatening. *This was recommended by orthopedics as well at his last visit on 9/15/21. Patient states that he will first reach out to Dr. Talusan's office today to confirm their recommendations as well before deciding on going if he will go to the ED.*

*Id.* at PageID.658 (emphasis added). In a report filed on April 22, 2022, Plaintiff's doctor concluded that Plaintiff had presented to the hospital with an infected wound on September 29, 2021, a full year after he was released from jail. In fact, Plaintiff's amputation did not occur until June 23, 2022, ECF No. 31 at PageID.302, nearly two years after his release from the Alpena County Jail on August 19, 2020.

Defendants argue that the fall Plaintiff suffered outside of the Alpena County Jail on August 2, 2021, is what led to his amputation, and not any deliberate indifference by either Defendant Piaszak or Mischloney.

Plaintiff does not address Defendant's causation argument outright and instead argues that neither Defendant Pioszak nor Mischloney treated him for an infection while he was in jail. ECF No. 36 at pageID.688. He also points out that Defendant Pioszak admitted that the yellow discharge he originally presented to her upon their first meeting *could* have been a sign of infection. *Id.* But this is not conclusive that (1) Plaintiff had an infection while in jail, or (2) that this infection, and not the subsequent infection plaintiff suffered after his fall a year post-discharge, is what led to his amputation.

Defendants argue that Plaintiff must present expert support to show that it was their conduct that led to his amputation. Courts have held in deliberate indifference cases dealing with infections that expert support on the causation element was necessary. See *Jackson v. Gibson*, No. 1:16-CV-993, 2018 WL 4566247, at *3 (S.D. Ohio Sept. 24, 2018) (holding that whether a delay in treating or failure to treat a cellulitis infection worsened a plaintiff's injuries was "not within the realm of lay understanding" and required expert testimony). Courts have also held that failing to provide

- 16 -

evidence of the causation element was grounds to reject a § 1983 claim on summary judgment. *See also*.*Wooler v. Hickman Cnty., Kentucky*, No. 5:05CV-247-R, 2008 WL 5412826, at *12 (W.D. Ky. Dec. 30, 2008) ("a plaintiff in a § 1983 action to avoid summary judgment must, at a minimum, come forward with such evidence that a reasonable juror could find by a preponderance of the evidence to a reasonable medical probability that the alleged constitutional violation… caused the plaintiff's injury.").

Plaintiff has not identified an expert or presented a report demonstrating that it was the Defendants' conduct that caused his leg amputation. Likewise, Plaintiff has not presented any evidence to refute Defendants' claims that it was his August 2021 fall that led to the infection that caused his amputation. Therefore, for the additional reason of failing to prove a causal link between the Defendants' conduct and his injury, Plaintiff's deliberate indifference claims also fail.

## C.

Because this Court grants summary judgment as to Plaintiff's deliberate indifference claims, it must also do so as to Plaintiff's *Monell* Claims against ACH. The Sixth Circuit has consistently held that "under § 1983, a county can only be held liable if there is a showing of an underlying constitutional violation by the county's officials." *Andrews v. Wayne Cnty.*, 957 F.3d 714, 725 (6th Cir. 2020) (quoting *Burkey v. Hunter*, 790 F. App'x 40, 41 (6th Cir. 2020) (listing cases)). "Axiomatically, '[t]here can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act.'" *Andrews*, 957 F.3d at 725 (quoting *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007)).

Thus, because the Court concludes that Defendants Pioszak and Mischloney committed no underlying unconstitutional act, Plaintiff's *Monell* claim against ACH must also fail.

IV.

Lastly, Plaintiff filed a currently pending Motion for Voluntary Dismissal as to Defendant Alpena County, ECF No. 35, on February 12, 2025. Having resolved the rest of Plaintiff's claims on Summary Judgment, the Motion is granted for lack of prejudice to Defendant's ACH, Pioszak, and Mischloney.

V.

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 31, is **GRANTED.**

Further, it is **ORDERED** that Plaintiff's Motion for Voluntary Dismissal as to Defendant Alpena County, ECF No. 35, is **GRANTED.**

Lastly, it is **ORDERED** that Plaintiff's Complaint, ECF No. 1, is **DISMISSED WITH PREJUDICE.**

**This is a final order and closes the case.**

Dated: September 23, 2025                     s/Thomas L. Ludington
                                              THOMAS L. LUDINGTON
                                              United States District Judge